## MATTER OF WALSH and POLLARD

### In Exclusion Proceedings

A-26491503
A-26491504

*Decided by Board February 26, 1988*

(1) A foreign corporation must have invested or be actively in the process of investing a substantial amount of capital in order to qualify as a treaty investor under section 101(a)(15)(E) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(E) (1982).

(2) Under the treaty investor criteria, no particular dollar amount is required for an investment to be deemed substantial; however, the investment must be in a bona fide business and, in the case of a new business, the investment must not be in a marginal enterprise solely for earning a living but must be of an amount normally considered necessary to establish a viable enterprise of the nature contemplated.

(3) The applicants, who are employed as automotive design engineers by a foreign corporation, do not have supervisory or managerial duties; however, they are highly trained, specially qualified, and essential to the corporation's efficient operation and thus qualify for an "E-2" visa classification even though they are not engaged in developing and directing the qualifying investment.

EXCLUDABLE: Act of 1952—Sec. 212(a)(20) [8 U.S.C. § 1182(a)(20)]—No valid immigrant visa (both applicants)

ON BEHALF OF APPLICANTS:
H. Ronald Klasko, Esquire
Abrahams & Loewenstein
Fourteenth Floor
United Engineers Building
30 South 17th Street
Philadelphia, Pennsylvania 19103-4096

ON BEHALF OF SERVICE:
David M. Dixon
Appellate Counsel

Michael K. Adams
District Counsel

BY: Milhollan, Chairman; Dunne, Morris, and Vacca, Board Members

On March 2, 1987, the Chief Immigration Judge found the applicants admissible as treaty investor employees under section 101(a)(15)(E)(ii) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(E)(ii) (1982). He ordered that the exclusion proceedings be terminated and that the applicants be admitted pursuant to their

"E-2" visas. The Immigration and Naturalization Service has appealed from that decision. The appeal will be dismissed.

The applicants are natives and citizens of Great Britain, ages 59 and 25 years old, who are automotive design engineers. They attempted to enter the United States as nonimmigrants on September 18, 1985, by presenting "E-2" visas. They are employees of IAD Modern Design, Ltd. ("IAD, Ltd."), a British-owned corporation, which is the treaty investor in this case.[1] They are coming to the United States pursuant to a contract between IAD, Ltd. and General Motors ("GM") to provide experienced automotive design engineers to GM for the purpose of redesigning GM's line of cars in a smaller, more European fashion. The less experienced man is a transmission designer with a Higher National Certificate, indicating extensive post-secondary education, and with special training in computer-aided design. The more senior man is also to be employed in the United States as a transmission designer. He has approximately 30 years of varied automotive design experience and a Higher National Certificate. It was stipulated that there are not sufficient numbers of United States automotive design engineers to fill the present needs of the automotive industry. IAD, Ltd. expects in the future to bring as many as 300 designers and other related workers to the United States to meet the demands of United States automotive manufacturers.

Under the present arrangement these two designers would report to a GM subsidiary, Hydra-matic, to work on projects as assigned. They would be paid an hourly wage and a daily living allowance plus bonuses by IAD, Ltd. GM reimburses IAD, Ltd. for the applicants' services by purchase order at a higher hourly rate than the applicants receive from their employer. The applicants do not receive any fringe benefits from GM but remain employees of IAD, Ltd.[2] The applicants in question began work for IAD, Ltd. just before being sent to the United States. A representative from IAD, Ltd. testified that the applicants would be offered other work with IAD, Ltd. upon their return to England.

In order to facilitate and expand contract relationships between IAD, Ltd. and American automobile manufacturers, the British

[1]The parent corporation of IAD Modern Design, Ltd. is IAD (UK) Ltd., formerly Tigergraph, Ltd. The parent company is a substantial business specializing in automotive design with branches or affiliates in several countries.

[2]In similar cases involving a request for permission to bring alien workers to the United States to work for United States firms pursuant to a contract between an American firm and the the petitioning firm, it has been held that the foreign workers are employees of the petitioning firm. *Sussex Engineering, Ltd. v. Montgomery*, 825 F.2d 1084 (6th Cir. 1987); *Matter of Artee Corporation*, 18 I&N Dec. 366 (Comm. 1982) (both involving denials of "H-2" visa petitions).

cor oration formed a Michigan corporation, IAD Modern Design, Inc. ("I, D, Corp."), which is a wholly owned subsidiary. The corporation also assists the British workers in their relocation and business rela ionships with GM. This corporation was established by renting offi es, purchasing office furniture, and hiring two United States citi en employees. This corporation has a bank account of approximately $15,000. Expansion is expected as business increases.

The Chief Immigration Judge found that the British company qualified as a treaty investor based on the investment in IAD, Corp. He further found that the applicants were highly skilled individuals in a responsible position, whose skills were necessary to the IAD, Ltd. investment in the United States. He concluded that they were essential to the IAD, Ltd. investment because American design engineers were not available to be hired to enable IAD, Ltd. to fulfill its contract with GM. He therefore granted them admission.

The Service contends that the British company has not made a substantial investment in the United States as required by section 101 (a)(15)(E) of the Act. It also states that the applicants are not entitled to enter the United States as employees of the treaty investor because they are not coming to develop and direct the investment of the treaty investor. The Service argues that it is its policy to require employees of treaty traders to meet the "develop and direct" test.

The Service also objects to the failure of the Chief Immigration Judge to sequester Michael Hyatt and Ralph Miller, witnesses in this proceeding; to his requirement that the Service go forward with the evidence upon the presentation of applicants' prima facie case; to his reliance upon sections from the Immigration and Naturalization Service Immigrant Inspector's Handbook not admitted into evidence; to the issuance of subpoenas to the Service; and to the adverse inferences drawn from the Service's failure to produce the subpoenaed material.

At oral argument the Service argued that the Chief Immigration Judge incorrectly placed the burden of proof on the Service and that he erred in granting entry because the applicants are not coming solely to develop and direct the treaty investor's investment in the United States. The Service contended that the issuance of a visa by the Department of State ("DOS") is not important, that the burden to show admissibility is on the applicants and that the DOS regulations cannot override the statute. The Service also argued that the applicants are not skilled in marketing or employment services, the purposes of IAD, Inc., the United States corporation. The benefit to the United States corporation from their employment is too indirect to qualify the applicants for "E-2" visas under the statute. In addition, the investment is not substantial and the subpoenas were not directed to

relevant and material evidence. The applicants countered that they qualify for "E-2" visas under the relevant DOS regulations as supported by the responses to the interrogatories by the State Department Visa Office and by Board precedent. The Service policy to the contrary was not a written policy and was not communicated to Service personnel. In addition, the applicants work for the largest United Kingdom automotive design company, not an employment agency. The applicants also maintained that the investor meets the proportionality and viability tests, which is what is required for substantiality of the investment.

In regard to the procedural objections, the decision to sequester witnesses is within the discretion of the immigration judge. *See generally Breneman v. Kennecott Corp.*, 799 F.2d 470 (9th Cir. 1986); *McKee v. McDonnell Douglas Technical Services Co., Inc.*, 700 F.2d 260 (5th Cir. 1983); *see also Morvant v. Construction Aggregates Corp.*, 570 F.2d 626 (6th Cir. 1978). The Service has not shown any abuse of discretion or any prejudice which resulted from failure to sequester the witnesses. *See United States v. West*, 607 F.2d 300 (9th Cir. 1979) (per curiam). On the issue of burden of proof, we agree with the Chief Immigration Judge that once an alien has presented a prima facie case of admissibility, the Service has the burden of presenting some evidence which would support a contrary finding. The Chief Immigration Judge found that the Service met its burden of going forward with the evidence and correctly placed the ultimate burden of proof on the applicants for admission. In his decision, the Chief Immigration Judge took administrative notice of the Immigrant Inspector's Handbook, which is not in the record. However, the Service has not shown the substantial prejudice required to invalidate the Chief Immigration Judge's decision. *United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 530 (1946); *McLeod v. INS*, 802 F.2d 89 (3d Cir. 1986). The issue of the propriety of the subpoenas is not before us as the Chief Immigration Judge did not draw any adverse inference from the Service's failure to produce the requested materials.

The burden is on the applicants to show that they are admissible to the United States. Section 291 of the Act, 8 U.S.C. § 1361 (1982). There are two main issues in this case: whether the British company qualifies as a treaty investor by reason of its investment in IAD, Corp. and whether the applicants qualify for "E-2" visas as employees of a treaty investor. The statutory section in question is section 101(a)(15)(E)(ii) of the Act. The Act provides that a treaty investor is

an alien entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which he is a national, ... solely to develop and direct the operations of an

63

enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital.

Section 101(a)(15)(E)(ii) of the Act.

It is the responsibility of the DOS to accept applications for treaty investor status and to issue the visa to the treaty investor or to its qualified employees. Section 221(a)(2) of the Act, 8 U.S.C. § 1201(a)(2) (1982); 2 C. Gordon & H. Rosenfield, *Immigration Law and Procedure* § 10.13(2)(F)(3) at 10-166 (rev. ed. 1988). It is the responsibility of the Service to determine admissibility of an alien who applies for admission at the border. Sections 103(a), 221(h) of the Act, 8 U.S.C. §§ 1103(a), 1201(h) (1982); 8 C.F.R. §§ 214.1(a), 235.1(d)(1) (1988).

Nothing in Title 8 of the regulations or the Immigration and Naturalization Service Operations Instructions ("O.I.") relates to the issue of "substantiality" of the investment. Since "substantial" is not defined in the statute, reference must be made to the DOS regulations for clarification. The definition in those regulations of investing a "substantial amount of capital" is "investing capital in a bona fide enterprise" as contrasted with "investment of a small amount of capital in a marginal enterprise solely for the purpose of earning a living." 22 C.F.R. § 41.41(a) (1987) (recodified at 22 C.F.R. § 41.51(b)(1) (1988)). The DOS Foreign Affairs Manual ("FAM") notes to 22 C.F.R. § 41.41 (the State Department regulations and instructions relating to treaty investor visas) amplify the concept of a "bona fide enterprise" by requiring "a real and active commercial or entrepreneurial undertaking, producing some service or commodity. It cannot be a paper organization or an idle speculative investment held for potential appreciation in value...." Vol. 9, Foreign Affairs Manual, Part II, 22 C.F.R. § 41.51 note 5.2 (hereinafter cited as FAM). In regard to the concept of investment, the FAM provides:

No minimum investment amount is required for E-2 status; however, the investment must be substantial. Using a "proportionality test," the consular officer should weigh the amount invested against either 1) the total value of the particular enterprise in question, or 2) the amount normally considered necessary to establish a viable enterprise of the nature contemplated. The alien need only satisfy the requirement of "substantiality" in one of the above ways, not both.

*Id.* at note 5.3-1.

The concept of "substantially" is further amplified as follows:

[T]he amount normally considered necessary to establish a viable enterprise is less susceptible to precise calculation. Here, the consular officer must draw on personal knowledge of the U.S. business scene to judge whether the amount the alien proposes to invest is reasonable for that type of business....

*Id.* at note 5.3-2.

> In small to medium-sized businesses, the term "substantial" necessarily connotes an investment of more than half the value of the enterprise, or an amount normally considered necessary to establish an enterprise....

*Id.* at note 5.3-3.

A Service memorandum in the record from the Assistant Commissioner, Adjudications, dated June 14, 1985, to the regional and district office cites this DOS interpretation with approval. However, in this case the Service argues that if only a minimum amount is invested, it would not qualify the alien for treaty investor status.

In regard to the second issue, the relevant Immigration and Naturalization Service regulation, 8 C.F.R. § 214.2(e) (1988), deals with length of stay and change of employer but does not define the term treaty investor. Certain language in the Operations Instructions apparently relates to employees of both treaty traders and treaty investors. It requires that the applicant's duties must be either "executive, managerial, or supervisory in nature"; or, if not, the applicant must "have *special qualifications* necessary for the firm's efficient operation." O.I. 214.2(e) (emphasis added). The O.I. indicates that in matters concerning treaty aliens, the inspector should consult the notes to 22 C.F.R. §§ 41.40 and 41.41 in the FAM. *Id.* The same language requiring consultation of the State Department regulations is contained in Operations Instructions 248.6, relating to change of status to treaty trader or investor.

The previous DOS regulation, 22 C.F.R. § 41.41(a) (1987), provided that a treaty investor must establish to the satisfaction of the consular officer that he qualifies under section 101(a)(15)(E)(ii) of the Act, that he intends to depart upon termination of his status, and, if he is an employee of a treaty investor, that he is employed in a *responsible capacity*. The regulations regarding visas have been revised and reorganized. *See* 52 Fed. Reg. 42,590 (1987). The regulations regarding treaty traders/investors are now recodified at 22 C.F.R. § 41.51 (1988). The language regarding "responsible capacity," has been eliminated in favor of the requirement that the alien have "special qualifications." 52 Fed. Reg. 42,605 (1987). Presently, 22 C.F.R. § 41.51(c) (1988) provides:

> An alien employee of a treaty trader may be classified E-1 and an alien employee of a treaty investor may be classified E-2 if the employee is or will be engaged in duties of an executive or supervisory character, or, if employed in a minor capacity, the employee has *special qualifications* that make the services to be rendered essential to the efficient operation of the enterprise. The employer must be:
>
> (1) A person having the nationality of the treaty country, who is maintaining the status of treaty trader or investor if in the United States; or

65

(2) An organization at least 50 percent owned by persons having the nationality of the treaty country who are maintaining nonimmigrant treaty trader or investor status if residing in the United States. (Emphasis added.)

The FAM requires that the applicant, if an employee of a treaty investor, "individually qualif[y] as a manager or a highly trained and specially qualified employee." FAM at § 41.51 note 2.3(e). It further provides:

The E classification is intended for specialists essential to the firm's U.S. operations, not for ordinary skilled workers. The burden of proof to establish that the applicant has special qualifications essential to the effectiveness of the firm's U.S. operations is on the company and the applicant. The consular officer should consider such factors as: the degree of proven expertise of the alien in the area of specialization, the uniqueness of the specific skills, the length of experience and training with the firm, the period of training needed to perform the contemplated duties, and the salary the special expertise can command. *Id.* at note 3.4-3(a). The consular officer is also advised to consider American labor market conditions in assessing whether competent United States workers are available to provide the skills needed by the treaty firm. *Id.* at note 3.4-3(e).

The Service Deputy Assistant Commissioner, Adjudications, testified at the hearing that it was the policy of the Service to require that the employee of a treaty investor be coming to directly or indirectly develop and direct the treaty investor's investment in the United States. Prior cases have held that to be eligible for treaty investor status under section 101(a)(15)(E)(ii) of the Act an alien must enter the United States solely to develop or direct the operations of the enterprise in which he has invested or is investing. *Matter of Kung,* 17 I&N Dec. 260 (Comm. 1978) (change of nonimmigrant status); *Matter of Lee,* 15 I&N Dec. 187 (R.C. 1975); *see also Choi v. INS,* 798 F.2d 1189 (8th Cir. 1986) (denial of application for extension of nonimmigrant status remanded). Although different results have been reached in different cases, in the past the test for an employee of a treaty investor has been whether the alien is employed by a qualifying investor of the same nationality in a "responsible capacity." *Matter of Nago,* 16 I&N Dec. 446 (BIA 1978); *Matter of Udagawa,* 14 I&N Dec. 578 (BIA 1974); *Matter of Tamura,* 10 I&N Dec. 717 (R.C. 1964); *Matter of Kobayashi and Doi,* 10 I&N Dec. 425 (D.D., R.C., Dep. Assoc. Comm. 1963) (change of status denied). Although the "responsible capacity" language has been eliminated from the regulations as republished in favor of the term "has special qualifications that make the services rendered essential," the introduction to the republication indicates that *no substantive changes* are included in the republication. 52 Fed. Reg. 42,590 (1987). In addition, the new language of the regulation reproduces precisely the language used in the previous 22 C.F.R. § 41.40 (1987) (relating to employees of treaty traders).

Therefore, the language used will be taken as equivalent to the prior language.

We find that the statute itself does not explain the term "substantial" and it does not address the requirements to be met by employees of treaty investor companies or corporations. The DOS has drafted the regulations which must be applied in this case. Under its regulations, the DOS issued the visas at issue. The replies to the interrogatories propounded by the DOS Visa Office indicate that the officials of that office find no error in the issuance of the "E-2" visas. As a general matter, great deference should be accorded to an agency's construction of a statute which it administers and the agency's interpretation of regulations it has drafted. *United States v. Larionoff,* 431 U.S. 864 (1977) (interpretation of own regulations accorded deference); *Morton v. Ruiz,* 415 U.S. 199 (1974); *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971); *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944) (statutory interpretation accorded deference). The Service contends that a minimum dollar amount is required to meet the substantiality test and that employees of the treaty trader must be coming to directly or indirectly develop and direct the treaty trader's investment in the United States. In opposition to the DOS interpretation, the Service has placed only an unpublished "policy," one aspect of which recently has been publicly contradicted by the official of the Service responsible for these policy issues.[3] The Service's requirement of a minimal investment, likewise, is not published or reflected in any written material. We cannot give weight to these alleged policies of the Service in the face of the DOS regulations and the Service's history of acquiescence with them. *See* OI 214.2(e), 248.6. If the Service disagrees with the regulations of the DOS, it should take advantage of existing mechanisms of inter-agency consultation to convince the DOS to change its regulations.[4] *See* sections 104(e), 105 of the Act, 8 U.S.C. §§ 1104(e), 1105 (1982).

In applying the DOS guidelines and regulations to the present case, we note that the employing company must first qualify as a treaty investor. In order to qualify as a treaty investor the company must have invested, or be actively in the process of investing, a substantial amount of capital. When Congress enacted the Immigration and Nationality Act of 1952, it enlarged the "E" visa class to include the

---

[3] Mr. Richard Norton, the Service Associate Commissioner for Examinations, stated in response to a question posed at a public conference that the Service agrees with the DOS that an employee of a treaty investor was not required to be in the United States to develop and direct the treaty investor's investment in the United States.

[4] The witness from the Service Central Office, the Deputy Assistant Commissioner, Adjudications, testified that the present DOS regulations were developed in close consultation with Service over a period of time.

"E-2" category. The only discussion of the substantiality issue was that the investment must be in "a real operating enterprise and not a fictitious paper operation." H.R. Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.C.C.A.N. 1653, 1697. The DOS regulations require a bona fide enterprise. The legislative history and the DOS regulations both fail to impose a dollar amount requirement for "substantiality" and adopt a definition that envisions a bona fide, viable business.

Since the present case involves an investment in a new business in the United States, the "amount normally considered necessary to establish a viable enterprise of the nature contemplated" test is applicable. FAM at § 41.51 note 5.3-1. In this case, the investment required to establish a viable and profitable business is not large. The evidence indicates the amount thus far actually invested and in the process of being invested is sufficient to accomplish its purpose. The business is in operation and is engaged in business activity on behalf of its parent company. Thus, the business created is a viable one. We find the present investment is sufficient to establish a profitable and viable business in the United States. As all of this amount has been provided by the treaty investor, the proportionality test is met.

Finally, the DOS regulation requires that the investment not be "in a marginal enterprise solely for the purpose of earning a living." 22 C.F.R. § 41.41(a) (1987) (currently 22 C.F.R. § 41.51(b)(1) (1988)). The gloss on this language in the FAM is that "[a]n applicant is not entitled to E-2 classification if the investment, even if substantial, will return only enough income to provide a living for the applicant and family." FAM at § 41.51 note 5.4. The note goes on to provide examples of ways to determine marginality, any of which are sufficient proof of meeting this requirement. The testimony indicates that, based on its like experience in other countries, the investor in this case reasonably expects substantial revenues from its investment far above a living wage. Moreover, it was established by testimony of the chief economist in the Michigan Department of Commerce that the investment is expected to expand job opportunities in the State of Michigan.

The next issue is whether the applicants fit within the category of employees of a treaty investor company qualified to come to the United States with an "E-2" visa. Nothing in the Service regulations relates to this issue. The only language in O.I. 214.2(e) relating to an employee of a treaty investor is that the applicant must have "special qualifications necessary for the firm's efficient operation." The applicable law, as found in 22 C.F.R. § 41.41(a)(3) (1987), formerly required that the alien be employed by a treaty investor in a responsible capacity. *See supra* p. 7. The regulations presently state

that an applicant must have special qualifications that make his services essential to the efficient operation of the enterprise. 22 C.F.R. § 41.51 (1988).

The standards for managerial personnel and for highly trained and specially qualified ("essential") personnel are basically the same for "E-1" and "E-2" visas. FAM at § 41.51 note 3.4-3(b). As noted above, the FAM note 3.4-3(a) lists factors to be considered in determining whether an alien possesses "specific qualifications" that are "essential" to the firm's United States operations such as: the degree of proven expertise, uniqueness of the specific skills, length of experience with the firm, the period of training, and the salary. There was considerable testimony at the hearing as to the skill and importance of the job performed by an automotive design engineer, as well as evidence regarding the high qualifications of the applicants. It was shown that even if one has an engineering degree, approximately 10 years are required to train an automotive design engineer. The one applicant has 30 years of experience. The computer skills of the younger applicant are unique. We agree with the Chief Immigration Judge that each of the applicants is to be employed in a highly creative job involving independent judgment and is thus occupying a very responsible position. They have special qualifications. Their employment is also essential to the treaty investor, as it could otherwise not meet its contract obligations.

As the applicants meet the requirements of the applicable regulations promulgated and interpreted by the DOS, they should be admitted.

Accordingly, they will be admitted.

**ORDER:** The applicants are ordered admitted to the United States as nonimmigrant treaty investors.

Board member Michael J. Heilman has abstained from consideration of this case.