**SUSSEX ENGINEERING, LTD., Plaintiff-Appellant (86–1629),**

v.

**James H. MONTGOMERY, Defendant-Appellee (86–1629).**

**E & S DESIGN & DEVELOPMENT, LTD. and Hawtal Whiting, S.A., Plaintiffs-Appellees (86–1550/2054),**

v.

**James H. MONTGOMERY, Defendant-Appellant. (86–1550/2054).**

Nos. 86–1629, 86–1550 and 86–2054.

United States Court of Appeals, Sixth Circuit.

Argued May 15, 1987.

Decided Aug. 11, 1987.

Rehearing and Rehearing En Banc Denied Sept. 25, 1987.

---

Norman C. Ankers, Honigan, Miller, Schwartz and Cohn, Detroit, Mich., James K. Robinson (argued), for plaintiffs-appellees.

David Bernal (argued) Office of Immigration Litigation, Dept. of Justice, Washington, D.C., Roy C. Hayes, U.S. Atty., Detroit, Mich., L. Michael Wicks, for defendant-appellant.

L. Michael Wicks (argued), Asst. U.S. Atty., Detroit, Mich., for defendant-appellee.

John F. Mills (argued) Bloomfield Hills, Mich., for plaintiff-appellant.

Before JONES and RYAN, Circuit Judges and CELEBREZZE, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

These cases involve the Immigration and Naturalization Services's (INS's) interpretation of the standards governing applications for temporary, nonimmigrant visas for foreign automotive design engineers. In 86–1629, plaintiff Sussex Engineering, Ltd. (Sussex) appeals the district court's entry of summary judgment in favor of defendant Montgomery, the district director of the INS, ruling that the agency's final decision denying Sussex's petitions for three temporary worker visas pursuant to section 101(a)(15)(H)(ii) of the Immigration and Nationality Act of 1952 (the Act), 8 U.S.C. § 1101(a)(15)(H)(ii) (1982) (H–2 petitions), was not arbitrary and capricious. In 86–1550, defendant Montgomery appeals the district court's order granting summary judgment in favor of plaintiffs, E & S Design & Development, Ltd. (E & S) and Hawtal Whiting S.A. (Hawtal), holding that

the agency's final decision denying plaintiffs' 91 H–2 petitions was arbitrary and capricious. In 86–2054, a related case, Montgomery appeals a subsequent order of the district court directing him to grant immediately the 91 H–2 petitions. Because of the common issue regarding the meaning of the statutory term "temporary services or labor," the cases were argued on the same day and are consolidated for opinion.

The General Motors Corporation, like other automotive manufacturers, requires the services of scores of design engineers to work on various, discrete automotive design projects. It is undisputed that there are currently insufficient "qualified" American automotive design engineers to satisfy the demands of the auto companies. The reputed "qualifications" for a senior design engineer are a two-year associate's degree and five to seven years experience as a draftsman. A four-year bachelor's degree allegedly makes an individual "overqualified." For this reason, General Motors has been utilizing English design engineers, employed by specialized temporary service agencies and entering the country on H–2 visas to work pursuant to one-year contracts, since at least 1978. We also note that General Motors initiated a community college program in 1980 to bolster the domestic pool of qualified labor. The first class of 50 domestic design engineers should become available later this decade.

### Sussex

Sussex Engineering is an independent professional design and engineering firm specializing in providing design and engineering personnel under contract to various automotive manufacturers. In May of 1985, Sussex filed three H–2 petitions for temporary worker visas in the Detroit INS office on behalf of three foreign-national automotive design engineers. This was the first time that Sussex ever filed H–2 petitions. These three alien automotive design engineers were to be employees of Sussex, working temporarily at the General Motors Tech Center in Warren, Michigan, designing car body interiors. In August of that year, district director Montgomery denied

the petitions on the authority of *In re Artee Corp.*, 18 I & N Dec. 366 (Comm. 1982), after finding Sussex's need for the design engineers to be ongoing rather than temporary. Sussex's administrative appeal from this decision was dismissed in November 1985.

The *Sussex* suit was filed December 19, 1985, pursuant to the Administrative Procedures Act, 5 U.S.C. § 701 *et seq.* (1982), alleging that the agency's final decision was arbitrary and capricious. The district court entertained oral argument on cross-motions for summary judgment on June 30, 1986, and rendered an oral opinion granting defendant Montgomery's motion. It ruled that the agency's decision was not arbitrary and capricious despite the fact that one identical petition "slipped through the cracks and was granted" while all the others were denied. "The one which was granted was clearly an oversight and an error." The court also stated that Sussex had a permanent need for design engineers to fulfill its ongoing contracts with General Motors. In support of this finding, the court cited the "permanent cadre" of such engineers maintained by Sussex. The court therefore concluded that the *Sussex* petitions were indistinguishable from those in *Artee* and likewise inappropriate under H–2. Sussex appeals this judgment, No. 86–1629.

### E & S Design

E & S Design and Hawtal Whiting are also engineering firms in the business of providing contract services to the auto companies. E & S and Hawtal have been contracting with General Motors to provide "temporary" English automotive design engineers every year since 1980. In March of 1985, E & S and Hawtal filed numerous H–2 petitions for such English engineers. On August 6, 1985, district director Montgomery denied 91 of those petitions under the authority of the *Artee* case. That very day, five identical petitions submitted by E & S were granted without explanation. Administrative appeals of the 91 denials filed by E & S and Hawtal were dismissed in September 1985.

E & S and Hawtal filed suit later that month.[1] Like the court in *Sussex*, the *E & S* court also heard argument on cross-motions for summary judgment. Unlike *Sussex*, the April 15, 1986 written opinion in *E & S* granted the petitioner-plaintiffs' motion.

The *E & S* opinion stated that even though plaintiffs fell short of satisfying the requirement of temporary services as defined in *Artee*, the district court still found that the defendant's denial of the 91 H–2 petitions was arbitrary and capricious for the following reasons. Initially, the court asserted that the defendant offered no explanation for denying the 91 H–2 petitions while simultaneously granting five others that were indistinguishable. The district court also expressed that the defendant's argument that action on the petitions might have been different had General Motors itself been the petitioning employer, rather than E & S Design and Hawtal, was necessarily erroneous and, in fact, strong evidence of arbitrariness and capriciousness. Finally, the district court noted that the Department of Labor had certified that there was a shortage of qualified domestic automotive design engineers. The court reasoned that H–2 visas were intended to alleviate just these types of deficiencies. Accordingly, the district court entered judgment for plaintiffs and "remanded to the defendant for the granting of the visa applications." Defendant Montgomery appeals this judgment, No. 86–1550.

When the defendant did not grant the 91 visa petitions immediately following remand, plaintiffs filed a motion to enforce the judgment in the district court. This motion was granted on September 2, 1986. The district court's order stated that the original judgment order was unambiguous and the defendant was therefore directed to issue 12–month H–2 visas, to run from the April 15, 1986 judgment. Defendant also appeals this order, claiming that he is powerless under 8 C.F.R. § 214.2(h)(6), (10) & (12) (1987) to grant such visas beyond

the April 24, 1986 expiration of the validity of the labor certification, No. 86–2054.

A federal court's review of an INS decision to deny an H–2 petition is limited to the determination of whether the agency's findings and conclusions are arbitrary and capricious, an abuse of discretion, or not in accordance with the law. 5 U.S.C. § 706(2)(A) (1982); *see also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413–14, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). We engage in plenary review of questions of statutory interpretation. *North American Indus., Inc. v. Feldman*, 722 F.2d 893, 898 (1st Cir.1983). Nevertheless, "[a]n agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985).

## I.

These cases are first and foremost about whether the INS is properly interpreting the statute providing for nonimmigrant, temporary worker visas. *See* 8 U.S.C. § 1101(a)(15)(H)(ii). Before we address that specific section, however, it is necessary to put the statutory scheme into perspective.

Section 214 of the Act, entitled "Admission of nonimmigrants—Regulations," provides:

(a) The admission to the United States of any alien as a *nonimmigrant* shall be for such time and under such conditions as the Attorney General may by regulations prescribe....

(b) Every alien shall be presumed to be an *immigrant* until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers, at the time of application for admission, that he is entitled to a nonimmigrant status under section 1101(a)(15) of this title....

---

1. Although both *E & S* and *Sussex* were filed in late 1985 in the Eastern District of Michigan, the cases were assigned to different judges.

(c) The question of importing any alien as a nonimmigrant under section 1101(a)(15)(H) or (L) of this title in any specific case or specific cases shall be determined by the Attorney General, after consultation with appropriate agencies of the Government, upon petition of the importing employer. Such petition, shall be made and approved before the visa is granted. The petition shall be in such form and contain such information as the Attorney General shall prescribe. The approval of such a petition shall *not*, of itself, be construed as establishing that the alien is a nonimmigrant.

*Id.* § 1184 (1982 & Supp. III 1985) (emphasis added).

Section 203 of the Act describes the allocation of *immigrant* visas, and lists categories of immigrants in order of preference. The "sixth preference" is for permanent workers:

(a) Aliens who are subject to the numerical limitations specified in section 1151(a) of this title shall be allotted visas as follows:

. . . .

(6) Visas shall next be made available, in a number not to exceed 10 per centum of the number specified in section 1151(a) of this title, to qualified immigrants who are capable of performing specified skilled or unskilled labor, *not of a temporary or seasonal nature*, for which a shortage of employable and willing persons exists in the United States.

*Id.* § 1153(a)(6) (1982) (emphasis added).

Finally, section 101 of the Act provides for some limited exclusions from the definition of "immigrant." One of those exclusions is the subject of our controversy:

(a) As used in this chapter—

. . . .

(15) The term "immigrant" means every alien except an alien who is within one of the following classes of nonimmigrant aliens—

. . . .

(H) an alien having a residence in a foreign country which he has no intention of abandoning ... (ii) who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country....

*Id.* § 1101(a)(15)(H)(ii). This is what is known as the "H–2" exception.[2]

For almost 20 years following *In re Contopoulos,* 10 I & N Dec. 654 (1964), the INS interpreted H–2 to require that "both the coming to the United States and the performance of service or labor must be temporary, the term 'temporary' being used twice." *Id.* at 657. Under *Contopoulos,* the INS determined temporariness by looking to the nature of the duties performed, not to the intent of the petitioner employer and the alien beneficiary concerning the time that the alien beneficiary would be employed in that position. This interpretation of "temporary services" was changed in *In re Artee Corp.,* 18 I & N Dec. 366 (Comm.1982).

In the *Artee* case, the petitioner was a "temporary help" service catering to technically-oriented firms. Explicitly abandoning as incorrect the *Contopoulos* standard, the Commissioner stated that: "It is not the nature or the duties of the position which must be examined to determine the temporary need. It is the nature of the need for the duties to be performed which determines the temporariness of the position." *Id.* at 367. Under the new *Artee* standard, the question in the instant case

2. Section 301(a) of the Immigration Reform and Control Act of 1986, Pub.L. No. 99–603, § 301(a), 100 Stat. 3411, 3416 (1986), amended H–2 to provide a new classification known as "H–2A" for alien agricultural workers:

Paragraph (15)(H) of section 101(a) (8 U.S.C. 1101(a)) is amended by striking out "to perform temporary services or labor," in clause (ii) and inserting in lieu thereof "(a) to perform agricultural labor or services, ... of

a temporary or seasonal nature, or (b) to perform other temporary service or labor". Pursuant to section 301(d) of the 1986 Act, this amendment of H–2 only applies to petitions or applications filed on or after June 1, 1987. Nevertheless, the standards for what we refer to in this opinion as H–2 (corresponding to the amended H–2B) were not materially affected by the 1986 Act insofar as they apply to the petitions in the case at bar.

is: Can the petitioner employment agencies credibly establish that they have not employed automotive design engineers in the past and will not need the services of such engineers in the near, definable future? *See id.* Because the focus is on the need of the petitioning employer, the Commissioner observed that a temporary employment agency does not have a temporary need where it maintains a "permanent cadre" of a specific type of worker to satisfy the fluctuating needs of various clients for such workers, even though any individual client may have only a temporary need. *See id.* at 367–68.

Plaintiff in *Sussex* argues that its situation is distinguishable from that of *Artee* because Sussex does not maintain a "permanent cadre" of alien design engineers in its employ, and in fact this is the first time Sussex has ever requested H–2 temporary worker visas. Sussex does admit, however, that it has a permanent contingent of domestic engineers in its employ that it regularly contracts out to the auto companies. We view the residency of the individual employees that compose the permanent cadre as irrelevant to the question of the temporary employment agency's need for a specific type of worker. Thus, we are not persuaded by Sussex's attempt to distinguish *Artee.*

Plaintiffs in both cases challenge *Artee* as an erroneous interpretation of the statute. All parties agree that to succeed under H–2, the petitioner must establish four statutory requirements: (1) that the alien beneficiary of the petition has a residence in a foreign country which he has no intention of abandoning; (2) that the beneficiary will be coming temporarily to the United States; (3) that the beneficiary will perform temporary services or labor; and (4) that unemployed persons capable of performing such services or labor cannot be found in this country. *See In re General Dynamics Corp.,* 13 I & N Dec. 23, 25 (1968). The first, second and fourth

prongs are not disputed. The INS, in *Artee,* revised the standards for establishing prong three, referring to the temporary nature of the services or labor. The INS now interprets the third requirement to mean that the need of the petitioner-employer for the alien beneficiary, or other workers with similar skills, will not be ongoing or recurring.

The relevant language of H–2, requiring that the alien beneficiary be "coming temporarily to the United States to perform temporary services or labor," has remained essentially unchanged since its enactment in 1952.[3] The legislative history of section 101(a)(15)(H) of the 1952 Act provides in pertinent part:

> The question of importing any alien as a nonimmigrant in this class is to be determined by the Attorney General as prescribed in section 214(c) [8 U.S.C. § 1184(c)] which sets forth a petition procedure. These provisions of the bill grant the Attorney General sufficient authority to admit temporarily certain alien workers, industrial, agricultural, or otherwise, for the purpose of alleviating labor shortages as they exist or may develop in certain areas or certain branches of American productive enterprises, particularly in periods of intensified production.

H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S. Code Cong. & Admin. News 1653, 1698. We do not consider this brief passage to provide a definitive answer to the question *sub judice.* We read this history to reflect the congressional intent to enact only the basic statutory framework, and to leave the details—such as the operating definition of the term "temporary services or labor"—to be filled in by the administrative process.

■ In our opinion, the Commissioner's interpretation of H–2 in *Artee* is a plausible reading of the statute in light of its stated goals and objectives.[4] So too was the old standard in *In re Contopoulos,* which *Ar-*

---

**3.** *See supra* note 2.

**4.** We note that the three federal courts which have discussed *Artee* have accepted its newly-announced interpretation of H–2 as correct. *See*

*North American Indus., Inc. v. Feldman,* 722 F.2d 893, 900–01 (1st Cir.1983); *Volt Tech. Serv. Corp. v. INS,* 648 F.Supp. 578 (S.D.N.Y.1986); *Wilson v. Smith,* 587 F.Supp. 470 (D.D.C.1984).

*tee* overruled. We cannot say that either standard is a more clearly correct interpretation of the statute than the other. Certainly the *Artee* standard is reasonable and it cannot be said to conflict with the expressed intent of Congress. This is exactly the type of situation where the court should defer to the statutory construction of the agency charged with that statute's administration. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 & n. 11, 104 S.Ct. 2778, 2782 & n. 11, 81 L.Ed.2d 694 (1984).

We rule that defendant Montgomery's action in rejecting the instant H–2 petitions was in accordance with the law.

## II.

■ Turning to the question of whether the district director acted arbitrarily and capriciously in denying these petitions, we address specifically the three grounds cited by the *E & S* court in its opinion. Essentially the same grounds are argued by the plaintiff-appellant in *Sussex*. First, the *E & S* court stated that defendant Montgomery offered no explanation for granting five H–2 petitions while, at the same time, denying 91 others. The statement is in error. The administrative record reveals that the inconsistent action on the five petitions was due to simple agency oversight, and defendant's answer stated that action had been taken to revoke the five petitions erroneously granted. It is absurd to suggest that the INS or any agency must treat acknowledged errors as binding precedent.

■ Second, the *E & S* court was very much disturbed by the suggestion that the agency decision *might* have been different had General Motors itself been the petitioner, rather than the temporary employment services. The court stated that the standard should be the same regardless of the identity of the petitioner, and that such a suggestion evidenced the defendant's arbitrariness. We think the district court overreacted. The *Artee* standard looks to the "needs" of the petitioner, not the petitioner's clients. As the Commissioner explained in *Artee*, there could conceivably be a difference between the two. As a practical matter, however, there would not have been a difference in the instant case since General Motors' need was just as continuous and ongoing as the plaintiffs'.

■ Finally, the *E & S* court observed that the Department of Labor had certified that there was a bona-fide shortage of domestic design engineers. This is well and good, but it only satisfies one of the four prongs of the statute. If the services are not temporary, even a *severe* labor shortage will not justify granting an H–2 petition. The statutory scheme of the immigration laws plainly anticipates that domestic labor shortages of a nontemporary or permanent nature should be alleviated by means of the "sixth preference" of section 203 of the Act, 8 U.S.C. § 1153(a)(6). *See Volt*, 648 F.Supp. at 580–81. *Compare* 1 C. Gordon & H. Rosenfield, *Immigration Law and Procedure* § 2.14a(2) (discussing H–2 category) *with id.* § 2.27(g) (discussing sixth preference).

For these reasons, we rule that defendant Montgomery did not act arbitrarily and capriciously or in abuse of his discretion in denying the instant petitions.

## III.

Because we determine that the district court's judgment in the *E & S* case must be reversed, there is no need for us to pass on the merits of the court's post-judgment implementation order of September 2, 1986. That order is summarily vacated.

In accordance with the foregoing discussion, the judgment in *Sussex*, No. 86–1629, in favor of the defendant Montgomery is AFFIRMED. The judgment in *E & S Design*, No. 86–1550, in favor of the petitioning employers is REVERSED. The post-judgment implementation order in *E & S Design*, No. 86–2054, is VACATED.