## MAXIMUM HOME HEALTH CARE, INC., Plaintiff,

v.

## Donna E. SHALALA, as Secretary of the United States Department of Health and Human Services, Defendant.

No. 3:99–0299.

United States District Court,
M.D. Tennessee,
Nashville Division.

July 27, 2000.

John P. Konvalinka, James Scott McDearman, Grant, Konvalinka & Grubbs, P.C., Chattanooga, TN, for plaintiff.

Michael L. Roden, Office of the United States Attorney, Nashville, TN, for defendant.

## MEMORANDUM

HAYNES, District Judge.

Plaintiff, Maximum Health Care, Inc, (Maximum) filed this action under 42 U.S.C. § 1395oo(f)(1), Title XVIII of the Social Security Act (the "Act"), 42 U.S.C. § 1395 *et seq.* that establishes Medicare,

the federally funded health insurance program. Maximum seeks judicial review of the decision of the Administrator of the Health Care Financing Administration (HFCA) rendered on behalf of the defendant, Donna Shalala, in her official capacity as the Secretary of the United States Department of Health and Human Services (Secretary). The gravamen of Maximum's claim is that the Administrators improperly reversed the decision of the Provider Reimbursement Review Board (PRRB), that Maximum was entitled to reimbursements for the management consultant fees Maximum paid to Diversified Health Management Company ("Diversified") for the fiscal years of 1990 and 1991.

Pending before the Court are the parties' cross motions for judgment on the administrative record and responses thereto, (Docket Entry No. 13, Plaintiff's Motion for Judgment on the Administrative Record); (Docket Entry No. 19, Defendant's Motion for Judgment on the Administrative Record and Response to the Plaintiff's Motion for Judgment on the Administrative Record); the Plaintiff's Reply (Docket Entry No.23); and the Defendant's Reply. (Docket Entry No.27).

Maximum contends, in sum: (1) that the Administrator relied upon an erroneous method to determine a reasonable management services fee; (2) that Administrator's auditor's componentized analysis under Medicare regulations reflects that the management fees paid by Maximum are reasonable and are not substantially out of line and thereby are required by the Medicare Act and regulations to be reimbursed; and (3) that the study conducted by an independent accounting firm also supports the PRRB's ruling that Plaintiff's management fees are reasonable and entitled to reimbursement.

The Secretary contends, in sum, that her decision must be upheld unless it is arbitrary, capricious, unsupported by substantial evidence, or otherwise not in accordance with the Medicare Act, regulations and guides. The Secretary contends that the Administrator's decision that the Plaintiff did not act as a prudent buyer, as reflected by Maximum's failure to solicit bids for these services, is supported by substantial evidence that includes an auditor's survey that shows the availability of these management services at lower prices in Maximum's geographic market. Further, Maximum's consultant's survey of management fees is flawed for its failures to define the market surveyed; to include the comparable management contracts and to exclude an aberration in prices that was used to justify its conclusion.

For reasons set forth below, the Court concludes that the prudent buyer standard utilized by the Administrator is a long-standing and acceptable method to determine the amount of reimbursement under the Medicare statutes, regulations and policies. The Administrator properly applied the prudent buyer principle in this action and that decision is supported by substantial evidence. The Administrator was not required to utilize the "substantially out of line" standard for the reimbursement decision. In any event, the Court concludes that the Administrator could properly decline to accept Maximum's evidence of a reasonable cost as based upon a flawed survey. Finally, the Court does not find any inconsistency that would constitute an arbitrary or capricious decision by the Administrator.

A. Review of the Record [1]

■■■ Maximum is a certified home health agency that provides services in

1. Upon judicial review of an agency decision, the Secretary is considered the fact-finder and deference is given to the Secretary's factual findings. *Thomas Jefferson Univ. v. Shalala,*

Watertown, Tennessee, the location of its principal office and at its offices in Gallatin, Murfreesboro, Nashville and Sparta, Tennessee. (Docket Entry No. 9 Attachment thereto Administrative Record at p. 74.) On January 26, 1988, Maximum entered into a management agreement with Diversified to provide a full range of management services effective March 1, 1988 at the rate of $11.50 per patient visit. *Id.* at 350. On April 17, 1989, Diversified's fee increased to $13.00 per patient visit effective March 1, 1989. *Id.* at pp. 365, 376. On May 17, 1990, Maximum and Diversified entered into another agreement to increase fees to $13.60 per patient visit. *Id.* at p. 392. The fee increase between 1988 and 1989 was 13.6%, and the increase between 1989 and 1990 was 4.6%. *Id.* at p. 350. Even though the fees increased, the services performed by Diversified did not change. *Id.* at p. 347.

Under the Medicare program, a Fiscal Intermediary (FI) contracts with the Secretary to process and audit payments to providers.[2] The fiscal intermediary reviews the cost report, undertakes any necessary audits, and informs the provider of the amount of Medicare reimbursement which the FI deems the provider is entitled through a written Notice of Program Reimbursement ("NPR"). 42 C.F.R. § 405.1803. Blue Cross and Blue Shields Association, and its subcontracting Plan, Blue Cross and Blue Shield of South Carolina, doing business as Palmetto Government Benefits Administrator is the regional home health FI for Medicare certified

home health agencies located in Kentucky, North Carolina, South Carolina, and Tennessee. Blue Cross was the FI that performed a study to determine the reasonableness of Maximum's management fees paid to Diversified for reimbursement. *Id.* By October, 1993 the FI determined that with some adjustments, Maximum's management services costs for 1990 and 1991 should be reduced for reimbursement by $137,626. *Id.* at p. 351, 545 and 547.

The FI found the contract to be fairly specific as to the services to be performed by Diversified, but because a progress report was not provided to document the quantity of services rendered, the FI's auditors performed a limited review to determine if the services were actually performed. *Id.* at p. 359. The FI found that Maximum did not obtain competitive bids for the outside management contract, as required by HCFA regulations. *Id.* at p. 351. In addition, the FI found that there was not any proof that the parties were related through ownership, and could not state whether the parties were related through control. *Id.* at p. 359.

The FI concluded that Diversified's fees were considerably higher than comparable fees in Maximum's market for similar contract services that ranged between $8.25 and $11.00 per visit. Diversified's fees were $13.00 for the fiscal year 1990 and $13.60 for the fiscal year 1991. Id. at p. 356. Accordingly, the FI proposed a fee adjustment to $9.74 for both 1990 and 1991. This figure was calculated by averaging the fees of the five management

---

512 U.S. 504, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994); *Shalala v. Guernsey Memorial Hosp.*, 514 U.S. 87, 115 S.Ct. 1232, 1236, 131 L.Ed.2d 106 (1995). Such findings by the Secretary are conclusive, if they are supported by substantial evidence in the record. *Wokojance v. Weinberger*, 513 F.2d 210, 212 (6th Cir.1975). The sole function of this Court herein is to determine whether the Secretary's decision is based upon such evidence

when examining the record taken as a whole. *Allen v. Califano*, 613 F.2d 139 (6th Cir.1980); *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir.1976). This section simply reviews the record and does not constitute separate findings of fact.

2. See *Fletcher Allen Health Care, Inc. v. Shalala*, 22 F.Supp.2d 313, 315 (D.Vt.1998).

contract firms' charges per home visit. Consequently, the FI's audit adjusted the reimbursement for Diversified's fee reducing it to $58,272.00 for 1990 and $74,750 for 1991. *Id.* at 547, 553.

In sum, the FI found that

[s]ince the reasonableness of the Provider's (plaintiff) management fees was not supported by adequate documentation, as addressed in the regulations noted above, (42 CFR §§ 413.9, 413.20, and 413.24), the intermediary had to resort to other analyses. Competitive bids were not obtained for the management services. Documentation was not submitted on the management group's expertise on health care management. Therefore the intermediary resorted to a comparison with other full service management contract's in the geographical area. The intermediary believes that this is an appropriate mean[s] of determining the fair market value of the management fees in the marketplace. The fee paid by the Provider was out-of-line with fees charged by other management groups in the vicinity.

*Id.* at pp. 360, 361.

Copies of the management contracts of the firms selected by the FI are included in this record. *Id.* at 363–472. These firms were: (1) Health Care Resources of Somerset, Kentucky that does business in Southern Kentucky; (2) Innovative Management Services, a Tennessee based company; (3) KyMO Company in Dresden, Tennessee; (4) Alpha Medical Management, a corporation in Chattanooga, Tennessee and (5) Health Financial Services, a Tennessee corporation. *Id.* at pp. 353–55.

Maximum appealed the FI's decision to the Provider Reimbursement Review Board (PRRB.)[3]. The PRRB found that the FI's fee survey, upon which it based its adjustments, was flawed for several reasons. First, "[t]here was little or no information in evidence regarding the manner in which the sample of five management companies was selected, ... [and therefore] the selection ... appeared to be arbitrary." *Id.* at p. 36 (PRRB Hearing Decision). The PRRB also stated that testimony of "Intermediary's witness indicated that Intermediary used only base costs per visit from the contracts of the companies surveyed and did not consider additional charges for duration of the contracts." *Id.* at p. 37. Finally, the PRRB found the FI did not compare Diversified's services to the services of the management companies in the survey. *Id.*

The PRRB also found the fee survey performed by the Peat Marwick firm, KPMG, for Maximum was more detailed because that survey considered a greater number of variables and companies. The PRRB also found the KPMG survey established a mean and standard deviation for management company rates. *Id.* Thus, the PRRB concluded that the fees paid to Diversified were well within the mean of $11.38 per visit with a standard deviation of $2.93 identified in the KPMG study. *Id.* PRRB also noted that the KPMG study finding of the average total cost per visit at $51.29 rendered Maximum's cost per visit of $52.44 and $52.60 in 1990 and 1991 reasonable. *Id.*

PRRB noted the FI's inconsistent application of the reasonableness standard for management fees paid and claimed on the earlier and subsequent cost reports of Maximum. *Id.* Specifically, PRRB found

**3.** The PRRB, composed of five individuals knowledgeable in the field of medical cost reimbursement, is appointed by the Secretary. Pursuant to the requirements of the Medicare Act, the Board must be comprised of two members representative of Medicare service providers. 42 U.S.C. § 1395oo(h). At least one member of the Board must be a certified public accountant. Id.

that the FI did not make adjustments to Maximum's per visit management fees to Diversified for fiscal year 1989, 1992, 1993, and 1994, all of which were higher than the fee allowed by the FI for 1990 and 1991. *Id.* PRRB also noted that the FI allowed management fees in excess to those allowed in this case for similar services for other providers in the area. *Id.*

The FI appealed the PRRB's decision to the Administrator of HCFA challenging the PRRB's decision on reimbursement of costs as substantially out of line with costs paid for similar services by other providers in Maximum's service area under 42 CFR § 413.9(c)(2).

Acting on the Secretary's behalf, HCFA's Administrator, reversed the PRRB's decision because Maximum did not attempt to compare prices in the market place as required by § 2135.3 of the Provider Reimbursement Manual (PRM), a set of interpretive rules that the Secretary issues to provide guidance to providers and intermediaries and clarify the Secretary's reimbursement regulations and policies.[4] *Id.* at pp. 2–11. Moreover, the Administrator found that Maximum failed to act as a prudent, cost-conscious buyer as required by § 2135 of the PRM. *Id.*

The Administrator reasoned, in sum, as to each of the cited deficiencies found by the PRRB that:

> The record shows that the Intermediary compared the market price for management and administrative services in Provider's geographical service area and found that the Provider's cost were not comparable to its marketplace. As such, the Intermediary adjusted the Provider's costs. Although the Provider challenged the validity of the Intermediary's survey, the Administrator notes that the Intermediary appropriately used man-

agement companies in the Provider's services area. In addition, the Intermediary used comparable "all inclusive service arrangements" as reflected by the contracts. Accordingly, as the contracts, on their face were all-inclusive, the Intermediary was not under a duty to search out whether additional fees were charged under the contracts. In addition, although the Provider claims that the Intermediary did not distinguish between one year term contracts, as opposed to three year term contracts, in its comparison, the Provider did not demonstrate that the later contracts were less costly. *Even if such contracts would be less costly, the Provider would be required to explain the basis for choosing the more costly term contract.* Thus, while the Provider argues that the Intermediary did not compare similarly situated providers, the Provider offers no substantial evidence to demonstrate any unique circumstances that would substantiate the Providers's higher costs from those of other providers used in the Intermediary's survey. *Moreover, the Board's adherence to "mean" and "standard deviations" in the application of the prudent buyer principle is applying an inappropriate level of precision to a guideline which is not intended to measure all possible data sources and account for all variables.* Finally, although the Board points to the intermediary's treatment of the costs in other years at issue. *Intermediaries from year to year have varying auditing focuses and resources, just as documentation presented by a provider to support the costs may vary from year to year.*

*Id.* at pp. 9–10. (Emphasis added.)

There is other evidence in the record that is relied upon by Maximum. First,

---

4. See *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 205 F.3d 937, 941 n. 5 (6th Cir.2000); *Univ. of Mich. Hosps. v. Heckler,* 609 F.Supp. 756, 757 (E.D.Mich.1985) (PRM is also for Medicare reimbursement guidance on calculating reasonable costs.).

the FI determined and the Administrator adopted the finding that Maximum's management services contract with Diversified yielded a cost savings over $310,000 and that "based on this analysis, the [FI] determined that it was prudent for [Maximum] to purchase management services." *Id.* at p. 7. Of the five management companies analyzed by the FI, only a single average of the base management fees of those companies was used. *Id.* at p. 174–177. The FI did not determine if those companies had charges other than a base fee per visit. *Id.* at p. 192. Maximum notes that the terms of those contracts were three years or more compared to Maximum's contract of one year. *Id.*

Maximum also notes that the field auditor's report reflects that a componentized analysis was performed "based on observation of the audit and actual documentation submitted by the provider ..." *Id.* at p. 400. Yet, Betsy Wheeler, a supervisor for the FI, testified that despite the field auditor's reference, the FI "[was] not able to obtain any documentation from the Provider such as progress reports as to the intensity and quantity of services performed." *Id.* at 172. In any event, Wheeler did not contest that Diversified was providing the services under the contract. *Id.* at 179.

At the hearing before the PRRB, Maximum offered proof of Nathan Perlman, a CPA and former FI, that based upon his review of the field auditor's report, Maximum's fee was reasonable. *Id.* at 123–24, 133. Rayburn Tankersley, the chief financial officer of one of the comparable management companies utilized by the FI also testified. Tankersley opined that the field auditor did perform a componentized analysis in accordance with the relevant Medicare Administrative bulletin. *Id.* at 130–7, 140. Tankersley likewise opined that the management fee paid to Diversified was "very reasonable". *Id.* at 140.

Finally, Maximum notes that for the years 1992 and 1993 the FI reimbursed Maximum for management fees at a rate of $14.50 per visit. *Id.* at 118. Other providers with whom Diversified had management service contracts had also been reimbursed in excess of $13.00 per visit for the years ending June, 1990 and June, 1991. *Id.* The Court notes, however, that the geographic locations of those latter companies were not identified.

### B. Conclusions of Law

### 1. Standards of Review

■ As to the applicable standard of judicial review of the Secretary's decision, the Supreme Court has stated that the Court's "jurisdiction to review Medicare reimbursement determinations is available only as prescribed in the Medicare Act." *Association of Seat Lift Manufacturers v. Bowen,* 858 F.2d 308, 314 (6th Cir.1988) (citing *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984)). "Appeals from adverse determinations on cost reimbursement under the Medicare Act may be had only as specifically set forth by Congress." *Id.* (citing *Riley Hospital & Benevolent Assoc. v. Bowen,* 804 F.2d 302, 305 (5th Cir.1986)).

The Medicare Act, for the purpose of judicial review of agency decisions, incorporates the provisions of the Administrative Procedure Act (APA), 42 U.S.C. § 1395oo(f)(1) incorporating 5 U.S.C. §§ 701–706. The APA provides the following standards for the scope of review of an administrative agency's decision:

> 'To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
> "(2) hold unlawful and set aside agency

action, findings, and conclusions found to be—" (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law; "(E) unsupported by substantial evidence in a case ... reviewed on the record of an agency hearing provided by statute." '

5 U.S.C. § 706.

In *Consolo v. Federal Maritime Com.,* 383 U.S. 607, 619 n. 17, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966), the Court noted that "the Administrative Procedure Act gives a reviewing court authority to 'set aside agency action, findings, and conclusions found to be (1) arbitrary, capricious, [or] an abuse of discretion ... [or] (3) unsupported by substantial evidence....'" The Sixth Circuit has held that when reviewing an agency action, a court must affirm unless the action is arbitrary or capricious or unsupported by substantial evidence. *Medical Rehabilitation Services, P.C. v. Shalala,* 17 F.3d 828, 831 (6th Cir.1994).

The Supreme Court has defined the term "arbitrary and capricious" standard for administrative decisions as follows:

> Normally, an agency rule would be arbitrary and capricious if the agency relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Manufacturers Ass'n. v. State Farm,* 463 U.S. 29, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

■ Great deference is generally owed to an agency's interpretation of its own regulations. *Fox v. Bowen,* 835 F.2d 1159, 1162 (6th Cir.1987). "In making a determination of the action by ... the Secretary, it must be recognized that an administrative agency's interpretation of its own

regulation is accorded considerable deference on judicial review unless it is inconsistent with the terms of the regulation, especially in areas like Medicare reimbursements." *University of Cincinnati v. Heckler,* 733 F.2d 1171, 1173–74 (6th Cir. 1984). "Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers." *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 943–944 (6th Cir.2000) (Quoting *Harris County Hosp. Dist. v. Shalala,* 64 F.3d 220, 221 (5th Cir.1995)). As the Seventh Circuit has aptly stated,

> The interpretation of a complex statute such as the Medicare Act by an administrative officer charged with the responsibility of administering it is entitled to considerable deference and, if reasonable, is not to be rejected by a court merely because another interpretation may also be reasonable.

*Health Care Service Corp. v. Califano,* 601 F.2d 934, 935–936 (7th Cir.1979).

■ A reviewing court may not "reverse an agency 'simply because it would have interpreted the [regulation] in a different manner.'" *Medical Rehabilitation,* 17 F.3d at 831; *Bedford County Gen. Hosp. v. Heckler,* 757 F.2d 87, 90 n. 1 (6th Cir.1985) (quoting *Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977)). Yet "the plain meaning of a statute controls, if there is one, regardless of an agency's interpretation." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Moreover, if the issues raised are strictly legal in nature, this Court may review them in a plenary manner. *Hospital Affil-*

iates *International, Inc. v. Schweiker*, 543 F.Supp. 1380, 1385 (M.D.Tenn.1982). "[T]he Secretary has no special expertise in addressing legal questions." *Medical Center of Independence v. Harris*, 628 F.2d 1113, 1117 (8th Cir.1980). Further, the reviewing court has the duty to correct the misapplication of the law, if the Court perceives an error. *Memorial, Inc. v. Harris*, 655 F.2d 905, 910 (9th Cir.1980).

 "Substantial evidence" means "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). *Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 147 (6th Cir.1990) Substantiality of the evidence must be based upon the record taken as a whole. *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir.1980). "Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the 'substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir.1978), quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Therefore, the Court "may not focus and base [its] decision entirely on a single piece of evidence, and disregard other pertinent evidence." *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir.1978).

In *Memorial Hospital/Adair County Health Center, Inc. v. Bowen*, 829 F.2d 111 (D.C.Cir.1987), the District of Columbia Circuit addressed the relationship between arbitrary and capricious standard and the substantial evidence standard.

We have previously discussed the general relationship between the "substantial evidence" and "arbitrary and capricious" standards, showing that they require equivalent levels of scrutiny. While the substantial evidence test concerns support in the record for the agency action under review, the arbitrary and capricious standard is a broader test subsuming the substantial evidence test but also encompassing adherence to agency precedent. Thus the substantial evidence test is that aspect of the arbitrary and capricious test usually applied to review of agency adjudications, but its use does not connote stricter scrutiny of agency action.

*Id.* at 117 (citations omitted).

2. Medicare Reimbursement Policy

In 1965, Congress enacted the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 et seq. (1982), to provide a comprehensive system of health care for the elderly and infirm. Part A of the program, codified at 42 U.S.C. §§ 1395c to 1395i–2, provides insurance for hospitalization and medical care for the elderly and disabled. Part B, codified at 42 U.S.C. §§ 1395j to 1395w, provides voluntary insurance for supplemental medical care for qualified recipients. Part C, 42 U.S.C. §§ 1395x to 1395xx, includes miscellaneous provisions applicable to Parts A and B. See *St. Luke's Hospital v. Secretary of HHS*, 632 F.Supp. 1387 (D.Mass. 1986). This action concerns Medicare Part A, which provides reimbursement for hospitalization, skilled nursing care and home health agency services. 42 U.S.C. § 1395 et seq.

The process by which the final amount of reimbursement is determined under the Medicare Act, regulations and guides is complex. The payment process begins when the provider files, at the end of each "cost year," a cost report with its fiscal intermediary. 42 C.F.R. § 405.406(b). *Tallahassee Mem. Regional Med. Ctr. v. Bowen*, 815 F.2d 1435, 1438 (11th Cir.

1987). Under Part A, the federal government reimburses eligible hospitals, nursing facilities, and home health agencies for the "reasonable costs" of covered services provided to Medicare beneficiaries in accordance with a Congressionally established scheme. 42 U.S.C. § 1395d. A final calculation as to reimbursable costs is made annually, at the close of the provider's fiscal year, and is based upon a "cost report" that each provider is required to file. 42 C.F.R. § 405.406(b). Medicare providers are reimbursed for their services either by the Secretary or, more commonly, by certain private organizations acting as fiscal intermediaries or (FIs) pursuant to contract with the Secretary. 42 U.S.C. § 1395h.

As part of their fiscal responsibilities, the FIs are required to ascertain the amount of reimbursement which accurately reflects the "reasonable cost" of the Medicare services provided by an eligible health care institution. Upon receipt of a provider's cost report, the FI must analyze the reported data, undertake any necessary audits and inform the provider, through a written Notice of Program Reimbursement, of the amount of Medicare reimbursement to which it is entitled. 42 C.F.R. § 405.1803.

If the provider is dissatisfied with this determination, and the total amount in controversy is at least $10,000, the provider may request a hearing before the Provider Reimbursement Review Board (PRRB). 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835. Within 60 days after a PRRB decision, the Secretary, on her own motion, may reverse, affirm or modify that decision. 42 U.S.C. § 1395oo(f)(1). Pursuant to the applicable provisions of the Administrative Procedure Act, 5 U.S.C. § 701 et seq., the provider may then seek review of the agency's final decision in federal district court. 42 U.S.C. § 1395oo(f)(1). *Northwest Hosp., Inc. v.*

*Hospital Serv. Corp.,* 687 F.2d 985 (7th Cir.1982).

In sum, the controlling issue here is whether the prudent buyer principle, as asserted by the Secretary, is an independent basis to reduce or deny reimbursement under the Medicare statutes regulations and guides or as Maximum contends, whether the substantially out of line rule for the determination of reasonable costs must be applied to reduce or deny a reimbursement. In any event, the related issue is whether the substantial evidence in this record support the Secretary's determination under the appropriate standard.

The Medicare Act on reimbursement, defines reasonable cost of a service subject to reimbursement under the Medicare Act as "the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services...." 42 U.S.C. § 1395x(v)(1)(A). This statute further provides that reasonable cost "shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs...." *Id.*

Under Medicare regulations, HCFA is assigned the duty of setting the limits for reasonable costs.

(a) Introduction. (1) Scope. This section implements 1861(v)(1)(A) of the Act, by setting forth the general rules under which *HCFA* [the Health Care Financing Administration, *an entity with authority to act on behalf of the Secretary of Health and Human Services] may establish limits on provider costs recognized as reasonable in determining Medicare program payments* ... (2) General principle. Reimbursable provider costs may not exceed the costs estimated by HCFA to be necessary for

the *efficient delivery of needed* health services.

42 C.F.R. § 413.30 (emphasis added).

The Medicare regulations further define the right to reimbursement and reasonable costs: "All payments to providers of services must be based on the reasonable cost of services covered under Medicare and related to the care of beneficiaries. Reasonable cost includes all necessary and proper costs incurred in furnishing the services, subject to principles relating to specific items of revenue and cost." 42 C.F.R. § 413.9(a). In addition to the above cited Medicare regulations, the Secretary issues a Provider Reimbursement Manual ("PRM") as a further guide to compliance with the regulations.

As to how reasonable cost is determined, the Secretary relies upon the prudent buyer concept that is set forth in several sections of the Provider Reimbursement Manual (PRM):

Reasonable Costs—Reasonable costs of services are determined in accordance with regulations establishing the method or methods to be used, and the items to be included.... Costs may vary from one institution to another because of the scope of services, level of care, geographic location, and utilization. It is the intent of the program that providers are reimbursed the actual costs of providing health quality care, regardless of how widely they may vary from provider to provider, except where a particular institution's costs are found to be substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors.... *Implicit in the intention that actual costs be paid to the extent they are reasonable is the expectation that the provider seeks to minimize its costs and that its actual costs do not exceed what a prudent and cost conscious buyer pays for a given*

*service. (See § 2103). If costs are determined to exceed the level that such buyers incur, in the absence of clear evidence that the higher costs were unavoidable, the excess costs are not reimbursable under the program.*

PRM § 2102.1 (emphasis added).

A. *General.—The prudent and cost conscious buyer not only refuses to pay more than the going price for an item or service, he/she also seeks to economize by minimizing cost* ... Any alert and cost conscious buyer seeks such advantages, and it is expected that Medicare providers of services will also seek them.

PRM § 2103 A. (emphasis added).

*Generally, a provider is prudent to solicit competitive bids.* Therefore, in the absence of competitive bidding which would otherwise be appropriate in the circumstance, the provider must demonstrate the manner in which it searched the marketplace for the most appropriate and effective means of obtaining services.

PRM § 2135.2 (emphasis added).

In contrast, Maximum relies upon the Medicare regulations setting forth the "substantially out of line" standard that reimbursement is premised upon whether a provider's costs are reasonable as compared to the costs of other firms for similar services in the provider's market or are "substantially out of line".

The costs of providers' services vary from one provider to another and the variations generally reflect differences in scope of services and intensity of care. The provision in Medicare for payment of reasonable cost of services is intended to meet the actual costs, however widely they may vary from one institution to another. *This is subject to a limitation if a particular institution's costs are found to be substantially out of line with other institutions in the same area*

*that are similar in size, scope of services, utilization, and other relevant factors.*

42 C.F.R. § 413.9(c)(2) (emphasis added).

In the PRM, there is a specific regulation for the cost of management services *Determination of the Reasonable Cost of Purchased Management and Administrative Support Services.*—Generally, purchased management and administrative support service costs are reasonable if the *costs incurred are comparable with marketplace prices for similar services, or provide for a total guaranteed cost equal to or less than the provider's current cost for such department or service.*

\* \* \* \* \* \*

1. *Evaluation of Services Purchased.*—The number and type of services furnished under a contract will influence the manner in which the services are evaluated. The cost of contracts providing for a package of services, such as a full service management contract, will be compared if possible against a comparable package of services, including those which might have submitted competitive bids. Where that is not feasible, or where the intermediary finds that this unilateral approach is insufficient to determine whether the costs incurred were, in fact, reasonable, it may be necessary to divide a package of services into separate components so that they can be evaluated with comparable services provided in the marketplace.

PRM § 2135.3. (Emphasis added).

Under either standard, a provider under the Medicare Act must maintain the necessary information to enable the Secretary or her designee to assess the reasonableness of the costs for which reimbursement is sought.

The principles of cost reimbursement require that providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program. Standardized definitions, accounting, statistics, and reporting practices that are widely accepted in the hospital and related fields are followed. Changes in these practices and systems will not be required in order to determine costs payable under the principles of reimbursement. Essentially the methods of determining costs payable under Medicare involve making use of data available from the institution's basis accounts, as usually maintained, to arrive at equitable and proper payment for services to beneficiaries.

42 C.F.R. § 413.20(a).

Although the prudent buyer principle has its origins in the PRM, as opposed to Medicare regulations, the Supreme Court held that this difference is not controlling and the PRM can be applied in making reimbursement decisions under the Medicare Act. "We also believe it was proper for the Secretary to issue a guideline or interpretive rule in determining that defeasance losses should be amortized. PRM § 233. The means to ensure that capital-related costs allowable under the regulations are reimbursed in a manner consistent [with] the statute's mandate that the program been [bear] neither more or less than its fair share of costs." *Shalala v. Guernsey Memorial Hosp.,* 514 U.S. 87, 97, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995), unless the PRM is inconsistent with the Medicare regulation. *Id.* 514 U.S. at 100, 115 S.Ct. 1232. Accord, *Your Home Visiting Nurse Services, Inc. v. Secretary of Health & Human Services,* 132 F.3d 1135, 1139 (6th Cir.1997) ("the Manual merely provides interpretive rules ... and such agency interpretive rules are subject to deference when they are not contrary to statute", citing *Guernsey* ).

The prudent buyer principle has been a part of the Medicare guidelines since 1971, but is related in its evolution to the substantially out-of-line rule as described in *GranCare Inc. v. Regency Health Services,* 93 F.Supp.2d 24 (D.D.C.2000).

The "prudent buyer" provisions in PRM §§ 2102.1 and 2103 were published in 1971 as an amplification of the provision for payment of actual costs, except to the extent that a provider's costs are substantially out of line, under the reasonable cost standard in 42 U.S.C. § 1395x(v)(1)(A) and the implementing regulation now codified at 42 C.F.R. § 413.9. See PRM Revision 44 (Nov. 1971). The "prudent buyer" principle was described by the Secretary, at that time, as "implicit in" the provisions for payment of actual costs except to the extent that they are substantially out of line. *Id.* at § 2102.1.

Furthermore, shortly after the adoption of § 413.106(c)(5) in 1975 (40 Fed.Reg. 5760, 5761–62 (Feb. 7, 1975) (codified at that time as 42 C.F.R. § 405.432)), the Secretary affirmed that in the absence of specific guidelines for a particular type of cost, ... "the incurred amounts of such costs are considered reasonable, unless they are shown to be substantially out of line with those incurred by comparable providers" under the regulation now codified at 42 C.F.R. § 413.9(c)(2) (formerly designated as § 413.451(c)(2)). Part A Intermediary Letter 78–16, [1978 Transfer Binder] Medicare & Medicaid Guide (CCH) P 28,971 at 9691 (Apr.1978).

\* \* \* \* \* \*

More recently, the Secretary confirmed that the "prudent buyer" principle does not establish a standard inconsistent with the substantially out of line limitation in 42 C.F.R. § 413.9(c)(2). In 1995, the Deputy Director of the Secretary's Bureau of Policy Development distributed a memorandum, stating:

> Regulations at 42 C.F.R. 413.9 provide that while Medicare payment based on a provider's reasonable costs is intended to meet the costs actually incurred, a limit applies where a particular institution's costs are found to be substantially out of line with other institutions in the same area which are similar in size, scope of services, utilization, and other relevant factors, or the costs are otherwise not reasonable. This limitation has been interpreted in various program manuals and instructions as a "prudent buyer" concept.

*Id.* at 31, 32.

Several courts have recognized the prudent buyer principle as a distinct basis for reimbursement decisions under the Medicare Act by FI's. *New Jersey Chapter Inc. of American Physical Therapy Assoc. v. Prudential Life Ins. Co.,* 502 F.2d 500, 504–05 (D.C.Cir.1974)

> As a fiscal intermediary making reimbursement to providers, therefore, Prudential is bound to apply the reasonable cost standard to claims submitted by providers. In fulfillment of its obligation, and in accord with HEW's 'prudent buyer' concept, Prudential issued its letter of November 23, 1971. We think this letter was a reasonable and proper attempt to outline a rational method for determining 'reasonable costs.' We think also that Prudential's use of guidelines of this type is within the authority conferred by the Act and HEW's regulations.

502 F.2d at 504–05. Accord, *LGH Ltd. v. Sullivan,* 786 F.Supp. 1047, 1054 (D.D.C. 1992) ("The Manual requires Medicare providers to act as 'prudent and cost conscious buyer[s]' who should, among other responsibilities, refuse [ ] to pay more than

the going price for an item") (quoting PRM. 2103); *New Jersey Speech–Language–Hearing Assn. v. Prudential Ins. Co.*, 551 F.Supp. 1024, 1026–27 (D.N.J. 1982) ("Intermediaries are therefore required to use the 'prudent buyer' principle to determine the reasonableness of expenditures for speech therapy services.")

In *Bowen*, the Court recognized the prudent buyer principle, but explained that its proper application requires a comparison of similar items or services. 829 F.2d at 118. Accord, *GranCare*, 93 F.Supp.2d at 30. One court expressed the view that its "review of the relevant statutes and regulations force the court to question the compatibility of the prudent buyer principle and the substantially out of line principle", but that Court did not decide that issue, only that the Secretary's application of the prudent buyer principle was erroneous. *Eagle Healthcare, Inc. v. Shalala*, 52 F.Supp.2d 1, 8, n. 3 (D.D.C.1999).

Maximum cites the "componentized analysis" as necessary for the determinations of a reasonable cost and if the provider's cost is substantially out of line with the reasonable costs. 42 C.F.R. 413.9(c)(2). Maximum also relies upon HCFA's Administrative Bulletin No. 1401,-801.01 that provides for this type of review of management fees.

> Once it has been determined that the provider and management company are not related organizations, a test to determine the reasonableness of the management fees must be made. *The best method for assessing the reasonableness of the facts is a componentized analysis.* A provider files annually with its fiscal intermediary a cost report identifying its total allowable costs incurred in treating Medicare beneficiaries for the just-completed year. This cost report serves as the basis for calculating the provider's Medicare reimbursement.

(Docket Entry No. 9, Attachment thereto Administrative Record at p. 321. (emphasis added)). This "componentized analysis" is more detailed and involves intense review and study of much more information, documentation and comparison among firms on such matters as "Onsite Staff", "Offsite Support", "Specialists Visits", "Other Services–Tangible", "Other Services–Intangible" and "Standby Services". *Id.* at pp. 322–26.

In reviewing the Medicare regulations and administrative bulletins, this Court concludes that PRM §§ 2103 establishes the prudent buyer principle as an alternative method to determine excessive cost. Under the Act, the Congress left to the Secretary's discretion to promulgate rules to determine and define reasonable costs. Here the Secretary's PRM 2103 clarifies any possible ambiguity that the prudent buyer principle is an independent test to assess costs. The Court defers to the Secretary's administration of this complex act to adapt alternative methods that are rationally based. Under the cited cases, the prudent buyer principle is a long established and accepted method to monitor reimbursement under the Medicare Act. The Administrator can elect to use this method over the more quantitatively demanding "componentized analysis" in 42 C.F.R. § 413.9(c)(2) and HCFA's Administrative Bulletin No. 1401,801.01. The Administrator can employ or design a system to monitor reimbursement costs with "a minimum of administrative burden." *University of Cincinnati*, 733 F.2d at 1174 (affirming the denial of reimbursement under the Medicare Act). The Court also stated:

> the Secretary was not required to "examine the bona fides and reasonableness of the loan," because this was "precisely the kind of investigation the regulation is designed to avoid." This court considered the same regulation in *Shaker*

*Medical [Center] Hosp. v. Secretary of Health and Human Services,* 686 F.2d 1203 (6th Cir.1982), and rejected the argument that it was arbitrary and capricious to condemn all related loans, and likewise rejected the claim that "the Secretary should be required to scrutinize the costs line-by-line and item-by-item in every transaction between related entities."

*Id.* (interpreting a similarly worded regulation, 42 C.F.R. Pts. 405, 419(( ))).

 To be sure, under PRM § 2103 and *Bowen* and *Eagle Core* that interpret § 2103, to determine if costs are excessive, the FI had to, "compar[e] the prices paid by a provider to the prices paid for similar ... services by comparable purchasers....". The PRM also makes it clear that to determine the propriety of reimbursement, usually requiring some type of comparison.

B. *Application of Prudent Buyer Principle.*—Intermediaries may employ various means for detecting and investigating situations in which costs seem excessive. Included may be such techniques as comparing the prices paid by providers to the prices paid for similar items or services by comparable purchasers, spotchecking, and querying providers about indirect, as well as direct, discounts ... Also, when most of the costs of a service are reimbursed by Medicare (for example, for a home health agency which treats only Medicare beneficiaries), examine the costs with particular care. In those cases where an intermediary notes that a provider pays more than the going price for a supply or service or does not try to realize savings available under warranties for medical devices or other items, in the absence of clear justification for the premium, the intermediary excludes excess costs in determining allowable costs under Medicare.

PRM § 2103 B. (emphasis added).

 This Court concludes that the FI's survey, in fact, compared Maximum's management costs with other similar management contracts of firms in Maximum's geographic market. Although not a scientific sampling, the FI's survey presents a fairly accurate measure of the comparable fees in Maximum's geographic market. Maximum is located in Tennessee. The FI studied four firms in Tennessee and one firm on the southern Kentucky border with Tennessee. (Docket Entry No. 9 Attachment thereto at pp. 417 to 473). A reasonable person could conclude that these firms are in Maximum's geographic market. The FI also had the management contracts of these firms that described the type of services that Diversified provided for Maximum. This contract analysis is sufficient for comparative purposes. The FI's survey of prices was reasonable. Except for one firm, the KMPG study submitted by Maximum showed that more firms charged in the same range of fees as did the firms in the FI's survey. In any event, the Court's duty is to determine if the FI's survey is reasonable, not perfect.

The next questions are whether the FI's survey needs to meet the requirements of a componentized analysis under HCFA Admin. Bulletin # 1401.80.01, and whether the KPMG's componentized study was more reliable than the FI's survey, as found by the PRRB.

Although a field auditor did refer to its study as a componentized analysis (Docket Entry No. 9 Attachment thereto at p. 401), the Administrator and the FI can elect to decide under either principle and in this case, the FI And Administrator applied the prudent buyer principle. *Id.* at 7–8, 170,183.

■ The Administrator noted that the KPMG's report did not disclose which firms were used in its survey and Maximum did not include the contracts of these firms in this record. The KPMG survey of the entire southeastern region defined the geographic market too broadly to reflect Maximum's actual market in Tennessee. Given the lack of definition in KPMG's survey of the market from which its data was drawn, the Court deems it reasonable for the Administrator to conclude that the KPMG survey is unreliable for comparative purposes under the prudent buyer principle or the substantially out of line principle. The Court also concludes that the Administrator gave sufficient reasons to decline the PRRB's decisions *supra* at p. 7 and the Court adopts the Secretary's decision that the Administrator's decision was neither arbitrary or capricious and is supported by substantial evidence.

■ The final argument advanced by Maximum is that the Administrator and FI were inconsistent in their rulings in that Maximum paid the same management fees to Diversified in 1989 as well as higher fees in 1992, 1993 and 1994, but neither the Administrator nor the FI challenged those reimbursements.

The Secretary responds with the Administrator's notation that any ruling on Maximum's 1990 and 1991 reimbursements are not to be construed as a ruling that the management fees for the cited years are reasonable. (Docket Entry No. 9, Attachment thereto at p. 10). Moreover, the Administrator explained that "[i]ntermediaries from year to year have varying auditing focuses and resources, just as documentation presented by a provider to support the costs vary from year to year." *Id.*

■ Under Sixth Circuit precedent, if an administrative agency "has not sufficiently justified its departure ... from its practice" at issue, the agency can be deemed to have acted in abuse of its discretion. *Spitzer Great Lakes Ltd. Co. v. United States, EPA,* 173 F.3d 412, 416 (6th Cir.1999). In *Spitzer,* the Sixth Circuit cited approvingly a First Circuit decision that it characterized as holding that "inconsistency with past practice can represent arbitrary and capricious conduct" by an administrative agency. *Id.* citing *Puerto Rico Sun Oil Co. v. United States, EPA,* 8 F.3d 73, 77 (1st Cir.1993). Yet, an "administrative agency may reexamine its prior decision and may depart from its precedents provided the departure is explicitly and rationally justified." *Id.* (quoting *Michigan v. Thomas,* 805 F.2d 176, 184 (6th Cir.1986)). Inconsistencies due to "simple agency oversight" or "acknowledged errors" that are corrected, do not warrant judicial relief. *Sussex Engineering Ltd. v. Montgomery,* 825 F.2d 1084, 1090 (6th Cir.1987).

The 1989, 1992 and 1994 audit reports of Maximum's management fees are not in this record for judicial review for application of inconsistent standards. The amounts paid obviously suggest inconsistencies. In a less complex administrative scheme, the Court would view these obvious inconsistencies with serious concern, but in this complex area of reimbursement, the Court accepts the Administrator's explanation that audit results can turn on the availability of data for a particular audit. Without these cited audits with higher approved fees, the Court also is unable to substitute its judgment for the Secretary's as to the underlying reasons for these obvious inconsistencies. Of course, with the validity of the 1990 and 1991 administrative decisions, the reimbursements for the cited years appear to be a windfall, if the same standards and factual findings were applied to them.

Therefore, for the reasons set forth above, the Court grants defendant's mo-

tion for judgment on the administrative record and denies the plaintiff's cross motion for judgment on the administrative record.

An appropriate Order is filed herewith.